**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael I. MONUS, Defendant–Appellant.**

**No. 95–4326.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 8, 1997.

Decided Oct. 21, 1997.

Peter D. Goldberger (argued and briefed), Law Office of Peter Goldberger, Ardmore, PA, Ramsey Clark (argued and briefed), New York City, for Plaintiff–Appellant.

John D. Sammon (argued and briefed), James V. Moroney (argued), Office of the U.S. Attorney, Cleveland, OH, for Defendant–Appellee.

Before: KENNEDY, GUY, and SILER, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

Defendant Michael Monus was convicted on all counts of a 109 count indictment that charged him with conspiracy to commit mail fraud, wire fraud, bank fraud, and transportation of funds obtained by theft or fraud under 18 U.S.C. § 371 (count one); with bank fraud under 18 U.S.C. § 1344 (counts two and three); with wire fraud under 18 U.S.C. § 1343 (counts four, five, eight, ninety-one, and ninety-two); with mail fraud under 18 U.S.C. § 1341 (counts six and seven); with interstate transportation of property obtained by theft or fraud under 18 U.S.C. § 2314 (counts nine through ninety, and ninety-three through 106); with filing false income tax returns under 26 U.S.C. § 7206(1) (counts 107 and 108); and with obstruction of justice under 18 U.S.C. § 1503 (count 109). Defendant raises several assignments of error. For the following reasons, we affirm defendant's convictions on all counts, vacate

his sentence, and remand to the District Court for sentencing consistent with this opinion.

## I. Facts

Defendant was the President and Chief Operating Officer of Phar–Mor, Inc. ("Phar–Mor"), a retail discount drugstore chain based in Youngstown, Ohio. David Shapira was the Chief Executive Officer of Phar–Mor, as well as being Chief Executive Officer of Giant Eagle, Phar–Mor's parent company and majority stockholder. Giant Eagle also owned, Tamco, Inc. ("Tamco"), which was one of Phar–Mor's major suppliers. Phar–Mor opened its first store in 1982 and expanded rapidly over the next decade. By 1988, it had opened eighty-one stores and had over one half of a billion dollars in annual sales. By July 1992, it had more than 300 stores located in thirty states and had gross revenues of $2.8 billion. Phar–Mor, however, began to experience financial difficulties in January of 1988. Initially, the most serious problem was a one to two percent decline in Phar–Mor's gross margin.[1] An investigation into the causes of this decline revealed that Tamco was shipping less merchandise than it was billing Phar–Mor. After this deficiency was discovered, Giant Eagle agreed to pay Phar–Mor seven million dollars on behalf of Tamco in mid–1988. Phar–Mor later bought Tamco from Giant Eagle in an additional effort to solve the inventory and billing problems. The monetary settlement with Giant Eagle and Tamco did not halt the decline in Phar–Mor's gross margin. The accounting department, headed by Patrick Finn, Phar–Mor's Chief Financial Officer, created weekly reports indicating the company's gross margin results. In early 1989, Finn showed defendant reports revealing that the gross margin remained disappointing. Defendant instructed Finn not to report the actual gross margin to the board of directors or to Shapira. At this point, defendant apparently was concerned that Giant Eagle would demand repayment of some of the seven million dollar settlement if it discovered that Tamco was not responsible for all of Phar–Mor's problems. According to Finn's testimony, defendant decided to alter the company's gross margin figures, inflating them to match historically expected margins, thereby understating losses and reflecting nonexistent profits.

Defendant continued to alter the weekly gross margin reports himself for a period of several months. He then instructed Finn to carry out the alterations himself. As soon as defendant and Finn started to alter the gross margin reports, they began to generate two sets of weekly financial reports—one containing the false, altered numbers and another containing the real numbers. The difference between the real and falsified figures were tallied in a separate account called the "bucket" or "subledger." The falsified reports understated liabilities and overstated earnings, and the subledger contained net losses. Because defendant and Finn distributed the false financial report to David Shapira and the Giant Eagle board of directors, it became known as the David Report.

Defendant and Finn also submitted these false financial statements to Pittsburgh National Bank, which increased a revolving credit line for Phar–Mor from $435 million to $600 million in March 1992; to Corporate Partners, an investment group that bought $200 million in Phar–Mor stock in June 1991; to Chemical Bank, which served as the placing agent for $155 million in ten-year senior secured notes issued by Phar–Mor; to Westinghouse Credit Corporation, which had executed a $50 million loan commitment to Phar–Mor in 1987; and to National Westminster Bank, which served as the placing agent for $112 million in Phar–Mor stock sold to various financial institutions in the fall of 1991. The submission of these fraudulent statements to these financial institutions formed the basis for the bank fraud, wire fraud, and mail fraud counts of defendant's indictment.

Defendant and Finn had to come up with a way to conceal the losses contained in the subledger. In the beginning, defendant in-

---

1. "Gross margin" is the difference between the cost of goods to Phar–Mar and the price at which the goods are sold to consumers. Phar–Mor's target percentage was 16.67% gross margin. Officials at Phar–Mor measured the company's gross margin every week.

structed Finn to offset losses in the subledger with "exclusivity funds"—large payments that suppliers made to Phar–Mor for the exclusive right to supply its stores with particular types of merchandise for a number of years. At the end of the fiscal year 1989, defendant and Finn had offset all the losses in the subledger in this manner. The David Reports, however, were still materially false, because the handling of the exclusivity money understated liabilities and overstated income.[2] According to Finn, defendant and he now feared that they would lose their jobs if the falsification were uncovered.

In fiscal year 1990, defendant and Finn hid other items in the subledger. For example, Phar–Mor had a joint advertising plan with some of its suppliers, which it called the "Power Plan." In 1990, when the Power Plan generated less income than was expected, the falsified financial statements reported the expected income and the shortfall went in the subledger. Defendant and Finn treated shortfalls in merchandise rebates from suppliers in the same manner. In addition, the subledger included unauthorized payments to the World Basketball League ("WBL"), a financially troubled professional sports league, in which defendant had invested heavily and of which, he was the majority owner. Defendant initially told Finn that he would repay the money with corporate sponsorships for the WBL that Phar–Mor buyers would solicit from suppliers. Payments from Phar–Mor to the WBL totaled $5.5 million in fiscal year 1991 and ultimately totaled approximately $8.8 million before this scheme was discovered. Over the course of 1990 and 1991, the subledger also concealed $568,000 in unauthorized Phar–Mor checks written to defendant or for his direct benefit.

By June 30, 1990, the subledger contained concealed losses at Phar–Mor totaling $38.5 million. In order to hide these losses from year-end auditors, defendant and Finn added $200,000 to the inventory account of each store that they knew would not be audited. For the time being they escaped detection. One year later, the subledger had grown to $148 million. Finn testified that he regularly discussed the size of the subledger with defendant. Jeffrey Walley, the vice-president of Phar–Mor, testified that from July 1990 to July 1991 he discussed the company's concealed losses with Finn and defendant between five and ten times.

In the fall of 1991, Stan Cherelstein became Phar–Mor's controller. John Anderson, the accountant at Phar–Mor who began preparing the subledger report in early fiscal year 1990, informed Cherelstein of the subledger. Cherelstein immediately objected to the existence of the subledger and demanded a meeting with defendant. In December 1991, defendant, Finn, Cherelstein, and Anderson held a meeting, where they discussed the losses and the payments to the WBL that had been concealed in the subledger. At this time, the subledger contained approximately $150 million, including almost $9 million in checks written to the WBL. At this meeting, defendant acknowledged his debt to Phar–Mor for the payments to the WBL and indicated that he would repay the company.

The size of the subledger continued to increase, even after this December 1991 meeting. As a result, Cherelstein demanded a second meeting in April 1992. Defendant, Finn, Anderson, Walley, and Cherelstein attended. Cherelstein secretly tape-recorded the meeting; the recording was played for the jury at defendant's trial and introduced as evidence.

In July 1992, Finn voluntarily exposed this fraudulent scheme to the United States Attorney in Cleveland, Ohio. Finn and Walley ultimately pleaded guilty to various charges. Defendant was first indicted in January 1993 on 129 counts of fraud, money laundering, and conspiracy. The case went to trial but resulted in a mistrial. On July 21, 1994, a 109-count superseding indictment was returned against defendant. Following a jury trial that lasted one month, defendant was convicted on all counts. The court imposed a

---

2. Finn testified that, according to generally accepted accounting principles, the exclusivity payments should have been amortized over the term of the contract, with a portion recognized as income each year and the balance accounted for as a liability that would have to be repaid if the contract was broken.

sentence of 235 months imprisonment and a fine of one million dollars.

## II. Discussion

On appeal, defendant argues that numerous errors at trial require a judgment of acquittal on count 109, reversal of his convictions on all counts, or in the alternative, vacation of his sentence and a remand to the District Court for re-sentencing. In particular, defendant raises the following claims: first, that there was insufficient evidence to support his convictions for ninety-six counts of interstate transportation of property obtained by theft or fraud; second, that his convictions for filing false income tax returns should be reversed because of insufficient evidence, improper testimony by expert witnesses, and jury instructions that amounted to plain error; third, that he is entitled to a judgment of acquittal on the one count of obstructing the due administration of justice because the indictment was insufficient, the evidence was insufficient to support a conviction, and the jury instructions amounted to plain error; fourth, that all of his convictions should be reversed because the inclusion of a jury instruction on deliberate ignorance was plain error; fifth, that his conviction on the conspiracy count should be reversed because the jury instructions were plain error; sixth, that a re-trial is required because the District Court improperly admitted statements made by Joel Arnold as statements made by a co-conspirator, under FED.R.EVID. 801(d)(2)(E); seventh, that prosecutorial misconduct, including improper comments on defendant's decision not to testify at trial, requires reversal of all his convictions; and eighth, that, at the least, his sentence should be vacated because the District Court violated FED.R.CRIM.P. 32(c)(1), improperly added four enhancement levels under the United States Sentencing Guidelines, misapprehended its power to depart downward from the Guidelines, and erred in imposing a one mil-

lion dollar fine. We consider each of his claims in turn.

### A. Interstate Transportation of Property Obtained by Theft or Fraud

### (Counts Nine to Ninety, and Ninety–Three to 106)

Defendant was charged and convicted of ninety-six separate violations of 18 U.S.C. § 2314.[3] Each count represented a separate unauthorized check that defendant caused to be issued from a Phar–Mor account. The eighty-two checks that form the basis for counts nine through ninety represent approximately $8.8 million in unauthorized payments that defendant caused to be made from Phar–Mor to the WBL. Counts ninety-three through 106 represent fourteen Phar-mor checks, totaling approximately $568,000, written to defendant or for his direct benefit. Defendant argues that the evidence at trial was insufficient to establish that the property involved in these counts was stolen or taken by fraud and that he knew this to be so.

■ We review allegations of insufficient evidence to determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir.1996) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We also resolve all conflicts in testimony and draw every reasonable inference in the government's favor. *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir.1992). "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir.1995).

**3.** 18 U.S.C. § 2314, provides, in pertinent part, that:

Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud ...

. . . .

Shall be fined under this title or imprisoned not more than ten years, or both....

18 U.S.C. § 2314.

To prove a violation of 18 U.S.C. § 2314, the government must prove the following essential elements:

(1) transporting, or causing the transportation, (2) in interstate commerce, (3) of property valued at $5,000 or more, (4) with knowledge that is has been stolen, converted, or fraudulently taken from its rightful owner.

*United States v. Weiner*, 755 F.Supp. 748, 752 (E.D.Mich.1991), *aff'd*, 988 F.2d 629 (6th Cir.), *cert. denied*, 510 U.S. 848, 114 S.Ct. 142, 126 L.Ed.2d 105 (1993).

Defendant argues that for each count under § 2314 the government failed to put forth sufficient evidence regarding the fourth element, whether that particular check represented money that was stolen, converted, or fraudulently taken, and whether defendant had knowledge of this. With respect to counts nine through ninety, defendant argues that the government failed to show in sufficient detail that at the specific time Phar-Mor issued each of the eighty-two checks to the WBL, it was not covered by funds that Phar-Mor had received or were receivable from corporate sponsors on behalf of the WBL. With respect to counts ninety-three to 106, defendant argues that the government failed to prove that each check "was not a proper payment or advance, or that it was not due and owing at the time of payment." We find these arguments to be without merit.

■ It is uncontested that defendant had invested heavily in the WBL since its founding in 1988, owned a team, the Youngstown Pride, and was the majority owner of the league itself. Finn testified that he assisted defendant in securing over $3.5 million in personal lines of credit and other financing, which defendant used to fund the Youngstown Pride and other WBL teams. Despite defendant's financial support, the league kept losing money. Defendant turned to Phar-Mor for financial help.

Finn testified at trial that Phar-Mor was authorized to spend $65,000 a year to sponsor the Youngstown Pride by advertising at its games and in its programs. Charity Imbrie, Senior Vice President, General Counsel, and Corporate Secretary of Giant Eagle, and Farrell Rubenstein, a member of Phar-Mor's Board of Directors and Chairman of its Audit Committee, testified that Phar-Mor was authorized to spend only $50,000 in sponsorship of the Youngstown Pride. Despite these limits to his authority, defendant directed large sums of money from Phar-Mor to the WBL. From October 1989 through February 1992, defendant directed Finn to write eighty-two Phar-Mor checks, totaling approximately $8.8 million, to the WBL.

Finn, Walley, Anderson, and Cherelstein all testified at trial to the elaborate means that they developed with defendant to conceal these payments from Shapira, the Boards of Directors of Giant Eagle and Phar-Mor, and others. Finn and Walley both testified that the checks were typewritten, instead being processed by Phar-Mor's computer system, in order to avoid detection and prevent leaving a trail for auditors. Anderson testified that the payments were tracked in a "dead account" in the subledger titled "KBL receivable." These payments were further concealed when the entire subledger was effectively erased by adding hundreds of thousands of dollars to individual stores' inventory accounts. Stan Cherelstein, Phar-Mor's Controller, testified that defendant told him that he would repay the almost nine million dollars that Phar-Mor had paid to the WBL with funds from the financing of a proposed plan to purchase the Denver Nuggets of the National Basketball Association. Charity Imbrie testified, however, that when defendant should have disclosed all payments that Phar-Mor made to the WBL, he only disclosed an annual $50,000 advertising expenditure by Phar-Mor to the Youngstown Pride. Rubenstein testified the had also questioned defendant about related-party transactions, specifically about Phar-Mor's relationship with the WBL. Rubenstein testified that defendant denied that Phar-Mor buyers were soliciting WBL sponsorships from Phar-Mor vendors and did not disclose any payments other than the authorized $50,000 advertising expenditures.

■ Counts ninety-three through 106 relate to fourteen Phar-Mor checks, amounting to approximately $568,000, paid directly to

defendant or for his personal benefit. Finn testified at trial that these checks, which paid for such items as an addition to defendant's personal residence and a diamond engagement ring, were hand written and hidden in various accounts just as the WBL payments had been. Finn also testified that each payment was in addition to the authorized compensation that defendant received, that none of these payments was authorized, and that none was reported on his earnings statements. One of the checks was recorded as an advance on a sale of Phar–Mor stock by defendant. Trial testimony showed that when the sale was completed, Finn asked defendant for the money, but defendant refused to repay the advance.

Viewing this evidence in the light most favorable to the government, we hold that it was sufficient to allow any rational juror to find the essential elements of counts nine through ninety and ninety-three through 106 beyond a reasonable doubt.

### B. Convictions for Filing False Tax Returns

### (Counts 107 and 108)

Defendant was convicted, under 26 U.S.C. § 7206(1),[4] of filing false personal income tax returns for 1990 and 1991. These charges resulted from defendant's failure to report as income the money that he embezzled from Phar–Mor through checks paid to the WBL, checks paid to himself, and checks paid to third parties for his benefit. He argues that the following errors require reversal of these

**4.** 26 U.S.C. § 7206 provides in pertinent part:

Any person who—
(1) ... Willfully makes and subscribes any return, statement or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ...
....
shall be guilty of a felony....
26 U.S.C. § 7206(1).

**5.** Were we to reach the merits of defendant's arguments, we would find them unpersuasive. The evidence at trial showed that he directed Phar–Mor accountants to issue checks to the WBL, to his personal accounts, and to at least one of his creditors. The evidence included testi-

convictions: first, that the evidence was insufficient to establish that he knew any of the omitted items were required to be included as income; second, that the expert testimony of I.R.S. Agent Kurzweil invaded the province of the jury to decide the facts underlying the charge; and third, that the jury instructions for counts 107 and 108 deprived him of his Sixth Amendment right to a jury trial. We consider these claims in turn.

### 1. Sufficiency of the Evidence

■ The record is devoid of evidence that defendant raised these sufficiency of the evidence claims before the District Court. Neither defendant's motion for judgment of acquittal made under FED.R.CRIM.P. 29 at the end of the Government's case and renewed after trial, nor his motion for a new trial made pursuant to FED.R.CRIM.P. 33 after trial, specifically contested the sufficiency of the evidence claim regarding Counts 107 and 108. Under *United States v. Carr*, 5 F.3d 986, 991 (6th Cir.1993), defendant has failed to preserve these issues for review on appeal. Therefore, we do not reach the merits of these claims.[5]

### 2. Ultimate Issue Testimony

■ IRS Revenue Agent Bradley Kurzweil testified at trial as an expert witness for the government regarding the two tax counts. Defendant argues that Kurzweil intruded on the province of the jury by testifying to underlying factual issues and offered impermissible opinions on a legal question.

mony that these payments were unauthorized, were never repaid, and totaled millions of dollars. The evidence also showed how, in both 1990 and 1991, defendant used this money for personal expenses and to fund a financially troubled sports league of which he was the majority owner and in which he had personally invested millions of dollars. The trial testimony also chronicled how defendant directed Phar–Mor accountants to conceal the payments, which they went to great lengths to do. The evidence showed that these sums were not included in his income tax returns, resulting in a substantial underpayment of tax due. When considered in the light most favorable to the government, there was more than enough evidence for a rational juror to conclude that defendant knowingly filed a tax return that failed to include income he knew to be taxable.

Defendant objects to the following trial testimony:

Q: If you assume that funds have been taken from Phar–Mor, which are not authorized, if you assume that those funds have been diverted to the World Basketball League, and assuming that is an entity owned by Mr. Monus, and you assume a specific amount of funds that have been diverted, what is the impact of those funds on Mr. Monus' tax liabilities for 1990 an 1991?

A: The dollar amount would be taxable to him in each year.

This testimony did not usurp the function of the jury. Kurzweil did not give his opinion about whether or not defendant was guilty; he merely gave his opinion that the events assumed in the question would trigger tax liability. Such testimony is permissible as an expert opinion to help the jury determine a fact in issue. *See United States v. DeClue*, 899 F.2d 1465, 1473 (6th Cir.1990) (finding that expert testimony of IRS agent regarding tax liability did not usurp function of jury because agent did not give her opinion about guilt of defendant).

Defendant's arguments that Kurzweil's testimony was an impermissible opinion on a legal question are also without merit. Defendant relies on *United States v. Zipkin*, 729 F.2d 384 (6th Cir.1984), where we held that it was impermissible for a judge to delegate the responsibility of deciding the law of the case "to a jury through the submission of testimony on controlling legal principles." *Id.* at 387. That did not occur in this case. Kurzweil did not give a legal opinion that necessarily determined the guilt of defendant or instructed the jury on controlling legal principles. He merely gave his opinion as to whether particular payments under assumed circumstances would be taxable. The jury still had to decide whether the defendant actually stole funds from Phar–Mor and knowingly failed to report them as income before it could conclude that defendant was guilty.

**6.** FED R.CRIM P. 52(b) provides that "[p]lain errors or defects affecting substantial rights may be

### 3. Error in Jury Instructions

■ Defendant argues that the District Court's instructions to the jury regarding the tax counts violated his Sixth Amendment rights to a jury trial, requiring reversal of his convictions on those counts. Because defendant did not object to the instructions at trial, we review for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure.[6] The Supreme Court's recent opinion in *Johnson v. United States*, —— U.S. ——, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), reaffirmed the following four-part inquiry for plain error:

[B]efore an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "seriously affect[s] substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error " ' "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." ' "

*Johnson*, —— U.S. at ——, 117 S.Ct. at 1549 (citation omitted) (alterations in the original) (quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993), quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), in turn quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

Defendant finds plain error in the following jury instructions:

In order to sustain its burden of proof for the crime of willfully filing a false tax return as charged in Counts 107 and 108 of the indictment, the government must prove the following four essential elements beyond a reasonable doubt.

One. The defendant, Michael I. Monus, made and signed a tax return for the years 1990 or 1991 that contained false information as to material matter as detailed in the indictment.

Two. The defendant knew that this information was false.

noticed although they were not brought to the attention of the court."

Three. The return contained a written declaration that it was being signed subject to the penalties of perjury.

And Four. In filing the false tax return the defendant, Michael I. Monus, acted willfully.

At trial, defendant did not request specific instructions for the tax counts, and the record does not reflect that defendant ever informed the District Court that he thought more detailed jury instructions were required. Nevertheless, defendant now argues that the District Court erred in not giving the jury a more detailed instruction. Defendant claims that the jury should have been told that it must first decide whether the payments to the WBL and those directly to defendant constituted embezzled funds, properly considered taxable income, or whether they were loans and advances made with a consensual recognition among the parties that they must be repaid, which would not be taxable. He also argues that the court erred in not instructing the jury on the definition of "embezzle" and what constitutes a "material matter." Defendant concedes that the jury instructions correctly described the material elements of the offense; he argues, however, that "factual issues necessary to any finding of guilt were not presented to the jury."

The District Court correctly instructed the jury that they must find that defendant knowingly and wilfully filed a false income tax statement. The overwhelming evidence at trial showed that defendant had no intention of repaying the money that he embezzled from Phar–Mor. It showed how defendant refused to repay some "advances," how he and others concealed these payments in false and fraudulent accounts, and how they removed these payments from the books through fraudulent accounting. Under these circumstances, we need not consider whether failing to give the jury a more detailed instruction on Counts 107 and 108 satisfied the first three prongs of the plain error inquiry. Even if it were error, it did not substantially affect the integrity, fairness, or public reputation of the judicial proceedings. Therefore, the jury instructions for these counts do not warrant reversal of defendant's convictions. *Johnson,* —— U.S. at ——, 117 S.Ct. at 1549.

## C. Obstruction of a Grand Jury Proceeding

### (Count 109)

Defendant was indicted and convicted of one count charging the defendant under 18 U.S.C. § 1503, which provides, in pertinent part, that "[w]hoever ... corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" shall be guilty of an offense against the United States. 18 U.S.C. § 1503. Before trial defendant moved to dismiss this count because, inter alia, the indictment failed to allege that defendant had knowledge of a pending judicial proceeding. The District Court denied defendant's motion. At the end of the prosecution's case, defendant moved for a judgment of acquittal pursuant to FED.R.CRIM.P. 29. The court denied this motion as well. The jury convicted defendant on this count based on evidence that he and other, unnamed persons shredded WBL documents in an attempt to obstruct pending grand jury proceedings. After he was convicted, defendant renewed his motion for a judgment of acquittal on Count 109 and moved for a new trial on all counts pursuant to Rule 33. The District Court denied both of these motions.

■ In order to sustain its burden of proof for a conviction for the crime of corruptly endeavoring to influence, obstruct or impede the due administration of justice, the government must prove three essential elements: (1) that there was a pending judicial proceeding, (2) that the defendant knew this proceeding was pending, and (3) that the defendant then corruptly endeavored to influence, obstruct, or impede the due administration of justice. *See United States v. Bashaw,* 982 F.2d 168, 170 (6th Cir.1992); *United States v. Williams,* 874 F.2d 968, 979 (5th Cir.1989).

Defendant argues that his conviction on Count 109 must be reversed for three reasons: (1) that the indictment failed to allege explicitly that defendant had knowledge of pending grand jury proceedings, (2) that the evidence at trial was insufficient to support a conviction, and (3) that the District Court erred in not including a supplementation to

its jury instruction that defendant had requested. We consider these claims in turn.

### 1. Sufficiency of the Indictment

■ Defendant argues that this indictment is insufficient because it failed to allege specifically that defendant had knowledge of the pending grand jury proceedings. We must decide whether the indictment, asserting that defendant "did corruptly endeavor to influence, obstruct, and impede the due administration of justice in a pending federal judicial proceeding, namely a Grand jury proceeding, by shredding and causing to be shredded books, records and other documents of and relating to the World Basketball League," sufficiently alleged the essential element of knowledge. *See Pettibone v. United States,* 148 U.S. 197, 206, 13 S.Ct. 542, 37 L.Ed. 419 (1893) (holding under predecessor to § 1503, that indictment "is not sufficient unless it appears the [defendant] knew or had notice that justice was being administered in such a court"). We affirm the District Court's decision that it did.

Our inquiry into the sufficiency of an indictment focuses on two factors:

> In general an indictment is constitutionally adequate "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

*United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 176 (6th Cir.1992) (quoting *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974)). In addition, an indictment is usually sufficient "if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *Id.* (citing *Hamling,* 418 U.S. at 117, 94 S.Ct. at 2907). Because the indictment in this case tracks the language of the statute, we must decide whether the statutory phrase "corruptly endeavors" fully and unambiguously conveys that defendant knew that a grand jury proceeding was pending.

Defendant, relying on *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), argues that an accusation the defendant "endeavored" to obstruct justice does not sufficiently allege the defendant's knowledge of a pending judicial proceeding. In *Aguilar,* the Court reaffirmed its decision in *Pettibone* that "if the defendant lacks knowledge that his actions are likely to affect the proceedings he lacks the requisite intent to obstruct." *Id.* at 599, 115 S.Ct. at 2362. The Court specifically held that evidence that a defendant told false statements to an investigative agent was insufficient to prove his intent to obstruct a grand jury proceeding because it failed to show that defendant knew his actions would be likely to affect that judicial proceeding. In so holding, the Court construed the statutory term "endeavor" as making "conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way." *Id.* at 601, 115 S.Ct. at 2363. Contrary to defendant's assertions, the Court did not indicate that an indictment that includes the term "endeavor" fails to assert that the defendant had knowledge of the pending proceedings.

We find, as the District Court and other courts that have considered this issue have found, that the statutory language "corruptly endeavors" alleges fully and unambiguously that defendant knew a grand jury proceeding was pending and intended to obstruct it. *See United States v. Haas,* 583 F.2d 216, 219–20 (5th Cir.1978) (holding that indictment under § 1503 relying upon statutory language "corruptly endeavored" was not invalid for "failure to allege the requisite intent and knowledge"), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979); *Seawright v. United States,* 224 F.2d 482, 482–83 (6th Cir.1955) (finding that indictment under § 1503 containing phrase "did ... wilfully endeavor" was not insufficient for failing to contain express allegation of knowledge); *United States v. Jackson,* 850 F.Supp. 1481, 1499–1500 (D.Kan.1994) (holding that indictment alleging defendants corruptly endeavored to obstruct grand jury investigation sufficiently alleged knowledge and intent); *United States v. Schwimmer,* 649 F.Supp. 544, 548 (E.D.N.Y.1986) (finding that phrase

"corruptly endeavors" "encompasses knowledge of a judicial proceeding and intent to impede it").

## 2. Sufficiency of the Evidence

■ Defendant argues that the District Court erred in denying his motion for a judgment of acquittal on Count 109 because the evidence at trial was insufficient to establish either that a grand jury proceeding was pending at the time the documents were destroyed, or that defendant knew the grand jury proceeding was pending. This argument fails.

■ The indictment charged defendant with shredding WBL documents on December 18, 1992. Defendant contends that no grand jury proceeding was pending at that time, because Lyons, the agent of the grand jury, did not present the evidence that he had collected to the grand jury until January 29, 1993. Until that time, defendant asserts, the investigation was an IRS and FBI investigation, not a grand jury proceeding. Our inquiry into whether a grand jury proceeding is pending focuses on " 'whether the subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury.' " *United States v. Tackett*, 113 F.3d 603, 612 n. 6 (6th Cir.1997) (quoting *United States v. Simmons*, 591 F.2d 206, 208–09 (3d Cir.1979)).

The witnesses at trial included Terry A. Lyons, a special agent with the FBI, who testified that he and an IRS agent investigated Phar–Mor, defendant, and the WBL. Lyons testified that the first grand jury subpoenas were issued August 19, 1992 to banks and accounting firms. These subpoenas had a return date of September 15, 1992. Lyons also testified that he contacted defendant's attorney regarding the investigation on November 2, 1992. Lyons testified that he also served a subpoena seeking WBL documents on Dr. John Geletka, the commissioner of the WBL, on December 4, 1992 and interviewed him regarding that subpoena on December 16, 1992. Lyons also testified that he was acting as an agent of, and records custodian for, the grand jury investigating Phar–Mor. He then testified before the grand jury, sum-marizing the documents that he had collected, on January 29, 1993. We find that this evidence was sufficient to establish that a grand jury proceeding was pending on December 18.

After considering the evidence presented at trial and drawing all inferences in the favor of the government, we also find that the evidence was sufficient to allow a rational juror to infer that defendant had acquired knowledge of the grand jury proceeding from Dr. Geletka. The evidence at trial included Dr. Geletka's testimony that he was a friend of defendant, had served with defendant on a state university board of trustees, and worked with him as commissioner of the WBL. Dr. Geletka testified that in September or October of 1992 he talked to defendant about removing boxes of WBL documents from his office building, and that sometime that fall movers from a local moving company removed everything from his office. FBI agent Lyons testified that when he interviewed Dr. Geletka on December 16, 1992 regarding the subpoenaed documents, Geletka was unable to provide them because they had been removed from the office to the warehouse of the Carney–McNichols Moving Company. Trial evidence included the testimony of Gregory Carney and Larry Hamilton, both of whom worked for Carney–McNichols. They testified that on December 18, 1992, two days after Lyons interviewed Geletka, they watched defendant and two unidentified individuals shred WBL documents. In sum, we agree with the District Court that there was sufficient evidence to support defendant's conviction under § 1503.

## 3. Error in Jury Instructions

■ Defendant argues that reversal of his conviction on Count 109 is also required because the District Court erred in refusing to give requested jury instructions. The District Court's refusal is only reversible error if the following three conditions are met: "(1) the [requested] instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instructions impairs the defendant's theory of

the case." *United States v. Carr*, 5 F.3d 986, 992 (6th Cir.1993).

█ The District Court's jury instruction on Count 109 included the following:

In order to sustain its burden of proof for the crime of corruptly endeavoring to influence, obstruct, or impede the due administration of justice as charged in Count 109 of the indictment, the government must prove the following three essential elements beyond a reasonable doubt:

One. The judicial proceeding identified in the indictment was pending at the time alleged in the indictment.

Two. The defendant, Michael I. Monus, knew this proceeding was pending.

Three. The defendant, Michael I. Monus, then corruptly endeavored to influence, obstruct, or impede the due administration of justice in the proceeding as detailed in the indictment.

Defendant complains that the court did not include his requested explanation that "[w]ith respect to the second element of the offense, it is not enough for the government to prove that the defendant knew an investigation was being conducted by the FBI or IRS. Rather, the law requires the government to prove beyond a reasonable doubt that the defendant had knowledge that a grand jury proceeding was pending."

Although the additional instruction that defendant requested correctly states the law, *see Tackett*, 113 F.3d at 612 n. 6, we find that the instructions delivered by the District Court substantially cover the information in the requested instructions. The delivered instructions inform the jury that they must find that the defendant knew that the Grand Jury proceedings were pending. We hold, therefore, that there was no reversible error in the jury instructions for Count 109.

### D. The Deliberate Ignorance Instruction

█ At trial the government requested a deliberate ignorance instruction to the jury. Defendant did not object, and the District Court instructed the jury as follows:

No one can avoid responsibility for a crime by deliberately ignoring the obvious.

A finding beyond reasonable doubt of intent of the defendant to avoid knowledge or enlightenment would permit the jury to infer knowledge. Stated another way, a defendant's knowledge of a particular fact may be inferred from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

It is entirely up to you whether you find any deliberate ignorance or deliberate closing of the eyes and the inferences to be drawn from any such evidence.

Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough for you to convict. This is, of course, all for you to decide.

The government requested this instruction because it thought Finn's testimony suggested that at times defendant avoided acquiring complete knowledge of the concealment of Phar–Mor's financial problems. Finn testified that defendant had "a very low tolerance level about discussing problems right around this time," and that it was difficult to schedule meetings with defendant about these problems.

Defendant contends that the trial included insufficient evidence of deliberate ignorance to support this jury charge. He argues, therefore, the charge invited the jury to convict defendant based on an unsupported theory. He asserts that this amounts to plain error requiring the reversal of defendant's convictions. We disagree. This issue is controlled by *United States v. Mari*, 47 F.3d 782 (6th Cir.1995), in which a defendant appealed his conviction on the grounds that there was insufficient evidence at trial to support a deliberate ignorance instruction that was virtually identical to the instruction given in this case. In *Mari*, we held that a deliberate ignorance instruction that might have been unsupported by sufficient evidence but did not misstate the law was at worst harmless error. *Id.* at 785–86. We recognized that we must assume that the jury obeyed the language of the district court's instructions. *Id.* at 785. The words of the instruction required the jury to find beyond a reasonable doubt that the defendant was deliberately ignorant before it could convict on that ground. Therefore, even if there had been

insufficient evidence to support a deliberate ignorance instruction, we must assume that the jury followed the jury charge and did not convict on the grounds of deliberate ignorance. Thus, another theory must have formed the basis for the conviction. *Id.* at 785–87. The *Mari* analysis governs this case, and we hold that the deliberate ignorance instruction was at worst harmless error.

### E. The Jury Instructions on Conspiracy

### (Count One)

■ Defendant argues that his conviction on the count of conspiracy must be reversed because the District Court committed plain error in the manner in which it instructed the jury on the issue of criminal liability for the acts of co-conspirators under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[7] Because defendant did not object to this instruction at trial, we again review for plain error.

The District Court's jury instructions regarding the conspiracy charge included the following charge:

Count 1 of the indictment accuses the defendant of committing the crime of conspiracy with others to commit the offenses of mail fraud, wire fraud, bank fraud and interstate transportation transmission or transfer of property with a value exceeding $5,000 which was stolen, converted or taken by fraud.

There are two ways that the government can prove the defendant guilty of *this crime*. The first is by convincing you that he personally committed or participated in *this crime*. The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy

as are within the reasonably foreseeable scope of the agreement.

(Emphases added.) The instruction then continued to explain the essential elements for a finding of guilt based on the *Pinkerton* doctrine. Defendant argues that this instruction might have allowed the jury to rely on the criminal acts of others to convict defendant for participating in a conspiracy, instead of relying on the acts of others to convict defendant of crimes committed by other members of the conspiracy.

The District Court delivered this particular instruction just after it had finished delivering a complete set of instructions on the elements required for the jury to find the defendant guilty of conspiracy. The court had already instructed the jury, among other things, that it could not find the defendant guilty of the conspiracy charge unless it found that he "knowingly and voluntarily joined the conspiracy." The record shows that instruction at issue here intended to inform the jury of the elements required to convict the defendant of the crimes that were committed by members of the conspiracy, namely counts two through 106 of the indictment. The problem with the instructions was that the Court used the singular "this crime" instead of the plural "these crimes." If the phrase "these crimes" had been used in the place of "this crime," the purpose of this particular instruction would have been more clear. Because the District Court had already delivered a complete and accurate set of jury instructions regarding the conspiracy count, we hold that, although it was awkwardly phrased, this instruction was not plain error, and reversal of his conviction for conspiracy is not warranted.[8]

### F. Admission of Statements of a Co–Conspirator

The District Court, over defense objection, allowed Finn to testify to statements made

---

7. Defendant also raises an argument that *Pinkerton* should be overturned. As defendant acknowledges, we have no authority to overrule Supreme Court decisions.

8. Even if we were to assume that the District Court erred in delivering this instruction, reversal would not be warranted. The trial included

overwhelming evidence that defendant knowingly and willfully participated in this conspiracy; any possible error did not "seriously affect the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

by Joel Arnold, Phar–Mor's Senior Vice President of Operations. The District Court held that these statements were admissible under Federal Rule of Evidence 801(d)(2)(E), which states that "a statement by a coconspirator ... during the course and in furtherance of the conspiracy" is not hearsay. Finn testified that Arnold told him that "he had discussed the situation several times with [defendant]. He was trying to prod [defendant] to get out of the subledger. He knew [defendant] was authorizing this and was behind it all along." Defendant argues that a new trial must be granted because the District Court erroneously decided that Arnold's statements fell within the scope of 801(d)(2)(E).

 Before a district court may admit statements of a co-conspirator under FED. R. EVID. 801(d)(2)(E), it must determine that "the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made 'in furtherance of the conspiracy.'" *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir.1992) (en banc) (quoting *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980)). The party offering the contested statements into evidence bears the burden of proving these three factors by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). The Court, in *Bourjaily*, also held that a district court may consider the hearsay statements themselves when inquiring into the existence of a conspiracy. *Id.* at 181, 107 S.Ct. at 2781–82. We review the District Court's conclusions for clear error. *Gessa*, 971 F.2d at 1261.

 Defendant does not challenge the District Court's determinations that a conspiracy existed and that defendant was a participant. Defendant argues, as he did in his motion for a new trial, that Arnold's statement should not have been admitted under the co-conspirator exception to the hearsay rule for two other reasons: first, he argues that the court committed clear error in deciding that Arnold was a participant in the conspiracy; second, he argues that the

statement admitted was not made in furtherance of the conspiracy. We find that the District Court's factual determinations on these issues were not clearly erroneous.

There was sufficient evidence at trial to establish that Arnold had agreed to join the conspiracy or actually participated in it. This evidence included Finn's testimony that Arnold, as Phar–Mor's Senior Vice President of Operations, received both the accurate financial statements and the falsified David Reports. Finn also testified that he and Arnold went to London to make presentations to potential investors regarding the 1991 sale of $112 million of Phar–Mor stock. At those meetings, Phar–Mor's representatives distributed the falsified financial statements to the potential investors. Finn also testified that after being questioned by Shapira and Rubenstein about an $80,000 payment to the WBL, he became worried that they would be unable to conceal all the other payments to the WBL. Finn testified that in this state of anxiety, he asked Arnold, "when this all blows up, are you going to come forward and tell the truth and say that [defendant] was behind this and authorizing this, directing this all along[?]" Finn then testified that Arnold replied that he "knew [defendant] was authorizing this and was behind it all along." Later, Finn had more concerns about their ability to continue concealing the unauthorized payments from internal and external auditors. He testified at trial that, at this point, Arnold told him that "all I needed to do was one more Houdini act, and we were back in business." In light of this evidence, we agree with the District Court's conclusion that Arnold was a co-conspirator.

 We also agree with District Court's determination that Arnold's statement was made in the furtherance of the conspiracy. "A statement is 'in furtherance of' a conspiracy if it is intended to promote the objectives of the conspiracy." *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994). We have recognized that "statements which prompt a listener to act in a manner that facilitates the carrying out of the conspiracy are admissible under (d)(2)(E)." *United States v. Jenkins*, 871 F.2d 598, 606

(6th Cir.1989). Statements that "identify participants and their roles in the conspiracy" also qualify as statements made in furtherance of the conspiracy. *Clark,* 18 F.3d at 1342. Arnold's statement to Finn, that "he knew [defendant] was authorizing this and was behind it all along," was intended to quell Finn's fears that their plans were about to unravel and to prod him to continue working to conceal the unauthorized payments. It also identified defendant as a key participant and explained his role in the conspiracy. This statement was clearly made in the furtherance of the conspiracy.

### G. Prosecutorial Misconduct

Defendant argues that prosecutorial misconduct requires reversal on all counts. He identifies the following specific instances of alleged misconduct: first, that prosecutors commented on defendant's decision not to testify at trial; second, that prosecutors improperly vouched for the veracity of their witnesses and had other witnesses vouch for their own veracity; and third, that for their last witnesses, prosecutors called government agents who gave improper legal opinions and vouched for the government's case.

 We find that defendant's second and third allegations of prosecutorial misconduct are without merit and turn our attention to his claim that the prosecution made two improper comments on defendant's decision not to testify at trial. The first comment was made in the following context. During defense counsel's cross examination of Finn, the following exchange occurred:

Q. So, sir, how is it—how can—how is it that you and Mr. Monus or Mr. Monus actually knew when it was necessary to all of a sudden change and falsify the gross margin report.

A. That'll be something you will have to ask [defendant] because it was his decision.

Defense counsel was trying to establish that it was illogical that defendant would take such great lengths merely to conceal reports of declining gross margin. Several questions later, defense counsel questioned Finn about the fear that Phar–Mor would have to return the seven million dollar settlement to Giant Eagle if it were discovered that Tamco was

not responsible for the declining gross margin. The following exchange occurred:

Q. So over—and the—and you weren't in danger over losing all $7 million? That wasn't a fear, was it?

A. Again, you would have to ask [defendant] to articulate the fear. It was his fear.

At closing arguments, defense counsel argued that Finn's testimony that the entire cover-up started with defendant's desire to protect the seven million dollar settlement with Giant Eagle was illogical. In response, the Assistant United States Attorney made the following statement to the jury: "What [defense counsel] wants you to do is impose his conception of what's logical upon these facts. And if you remember, after an hour of this [on cross examination] Pat Finn finally said, well, is it logical or reasonable what is going on, you have to ask [defendant]. I'm just telling you what happened." Defendant immediately objected to this comment as a veiled reference to the fact that defendant had not taken the witness stand to give his own explanation of what occurred. Defendant simultaneously moved for a mistrial. The District Court overruled the defense objection and motion for a mistrial, finding that the prosecutor's comment was made "in the context of what Finn was saying." No specific limiting instruction was given, other than the standard instruction that the jury should draw no inferences from the defendant's decision not to testify.

 The second allegedly improper comment by the prosecutor emerged as follows. At trial, Finn testified that he surreptitiously tape recorded a telephone conversation that he had with defendant from Finn's attorney's office. During cross examination, defense counsel challenged Finn's motives in making this taped conversation. In summation, defense counsel returned to this testimony and pointed out to the jury that there were a number of questions that Finn did not ask in that taped conversation. Counsel argued that the absence of these questions indicated that Finn was really trying to gather evidence against defendant to then turn over to the Government as part of a plea bargain.

Defense counsel argued that Finn's attempt to gather evidence failed because defendant was innocent.

In rebuttal summation, the prosecution responded by pointing out to the jury that there were a number of other questions that Finn did not ask on the tape, indicating that Finn had not been trying to gather evidence against defendant. The prosecutor posed the following questions that he argued Finn would have asked, had Finn really been trying to gather evidence:

Can you imagine what the questioning would have been if he was really trying to get evidence?

Mickey what about the $9 million in WBL advances?

Mickey, what about the $295 million [sic] of Phar–Mor money we ran through Jewelry 90?

Can you imagine the questions he would have asked him?

Defense counsel did not object to this argument at trial. On appeal, defendant argues that it also was an improper comment on defendant's decision not to testify because it emphasizes that defendant did not offer his own explanation from the witness stand.

 We review claims of prosecutorial misconduct as follows:

First, the Court should determine if the prosecutor's statements were improper. Then, if the statements were improper, the court must determine if the impropriety was flagrant under *United States v. Leon*, 534 F.2d 667 (6th Cir.1976). To determine flagrancy the court should consider four factors:

(1) whether the remarks tended to mislead the jury or to prejudice the accused [including whether the trial judge gave an appropriate cautionary instruction to the jury];

(2) whether they were isolated or extensive;

(3) whether they were deliberately or accidentally placed before the jury; and

(4) the strength of the evidence against the accused.

If the comment is determined not to be flagrant, we will reverse only "when (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction."

*United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir.1996) (citations and internal quotation marks omitted) (alterations in the original) (quoting *United States v. Brown*, 66 F.3d 124, 127 (6th Cir.1995), and citing *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994)).

We reject defendant's arguments that these two isolated comments require reversal of his convictions. The first comment by the prosecution was relevant to defendant's authorization and orchestration of Phar–Mor's fraudulent accounting practices. Perhaps it was not necessary to repeat Finn's testimony. However, defendant had elicited the statement and the prosecution was responding to defendant's argument. Even if this were error, however, it certainly was not flagrant. The second set of comments, the prosecutor's hypothetical questions to the jury, was proper argument in response to defense counsel's interpretation of the taped conversation. It would take at least two inferential steps for the jury to move from these questions to draw an inference based on defendant's decision not to testify. Even if these comments were improper, we would find they were not flagrant error.

## H. Defendant's Sentence

### 1. The District Court Proceedings

Defendant raises several issues regarding the District Court's calculation of his sentence according to the United States Sentencing Guidelines ("U.S.S.G."). The District Court sentenced defendant to 235 months incarceration, to be followed by five years of supervision upon release from prison. The court also fined defendant $1,000,000. The court sentenced defendant after the parties filed memoranda on sentencing issues and the court heard arguments from both parties regarding the pre-sentence investigation ("PSI") prepared by the United States Probation Officer. The PSI concluded that the offenses warranted a total offense level of

forty. Both the government and defendant filed objections to certain enhancements in the PSI and argued their objections before the court during the pre-sentence hearing.

The District Court calculated defendant's sentence as follows. First, it used a base offense level of six, as prescribed by U.S.S.G. § 2F1.1(a). Neither party objected to this determination. The court then considered the number of enhancements warranted according to the guideline provisions relating to specific offense characteristics. *See* U.S.S.G. § 2F1.1(b). The PSI calculated that defendant's conduct caused a guideline loss of $2,149,863,890.73, and recommended an enhancement of 22 levels for a loss exceeding $2000. This enhancement recommendation included an upward departure of four levels, because the sentencing guidelines provide for a maximum enhancement of eighteen levels based on a loss totaling $80 million. Defendant objected to the findings of fact supporting these enhancement levels. He argued that the PSI calculation overvalued the loss because it included the sums of money loaned to Phar–Mor and the purchase price of the stock sold to investors relying on the fraudulent financial statements, but did not offset these values by either the amount of collateral that the banks could recover, or the residual value of the stock after the fraud was discovered. Defendant also argued that the calculation counted amounts that should not have been considered for sentencing enhancement, including numerous consequential losses and losses entirely unrelated to the offense. Defendant argued that the appropriate enhancement was fourteen levels, based on a loss between five and ten million dollars.

At the sentencing hearing, the court expressed its concern that calculating the loss could require an evidentiary hearing with expert testimony regarding the value of Phar–Mor stock and the value of losses that could be attributed to factors unrelated to the fraud. The prosecution argued that such a hearing would not be necessary, because it could "easily get beyond the 80 million maximum" that is listed in the guidelines, thereby warranting an enhancement of eighteen levels. According to the prosecutor, the evi-

dence at trial and victim impact statements established over eighty million dollars of losses resulting from the approximately eleven million dollars that defendant embezzled from Phar–Mor and the $200 million in stock that Corporate Partners purchased and now testified was worthless. The court stated that it would enhance the base level by eighteen levels under § 2F1.1(b)(1) because it was "convinced that the defendant is at least the minimum amount [sic], at least responsible for in excess [of] 80 million dollars." It issued no further factual findings at sentencing and included its only written explanation in the judgment, where it noted that it adopted the factual findings and guideline application in the pre-sentence report except that "[t]he Court grants 18 points instead of 22 for Specific Offense Characteristic."

The PSI also recommended an enhancement of four levels because the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2F1.1(b)(6)(B). Defendant had argued that this enhancement was inappropriate because the specific counts that charged him with receiving money did not involve financial institutions. The District Court disagreed, specifically ruling that as long as the defendant received money out of the grouped offenses, he did not have to receive it directly from the financial institution, and imposed the four level enhancement recommended in the PSI.

The District Court also added a number of enhancements that defendant does not contest on appeal. As recommended in the PSI, the court added two levels for an offense involving more than minimal planning or a scheme to defraud more than one victim. The District Court added a four level increase because it found that defendant was the leader of criminal activity involving at least five others. It also added two levels, pursuant to U.S.S.G. § 3B1.3, because defendant abused a position of private trust in a manner that facilitated the commission or concealment of the offense. Finally the District Court added two levels based on obstruction of justice. In summary, the court reached a total point level of thirty-eight, as

opposed to the total of forty recommended in the PSI and the total of twenty-four suggested by defendant.

## 2. Defendant's Objections

On appeal, defendant raises four challenges to his sentencing. First, defendant argues that the court violated FED. R.CRIM. P. 32(c)(1) [9] and U.S.S.G. § 6A1.3(b) [10] by failing to make required findings of fact regarding disputed factors pertaining to the calculation of total loss suffered by the victims of defendant's offense. Finding no violation of § 6A3.1(b), which requires courts to resolve disputed sentencing factors in accordance with FED. R.CRIM. P. 32(a)(1), we consider whether the district court violated FED. R. CRIM. P. 32(c)(1).

■■■ Rule 32(c)(1) requires courts, at the sentencing hearing, to make either a factual finding for each contested factor of the PSI, or to make "a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." FED. R.CRIM. P. 32(c)(1). "This circuit requires 'literal compliance' with this provision," because such factual findings help "to ensure that defendants are sentenced on the basis of accurate information and provide[ ] a clear record for appellate courts, prison officials and administrative agencies who may later be involved in the case." United States v. Tackett, 113 F.3d 603, 613–14 (6th Cir.1997) (quoting United States v. Fry, 831 F.2d 664, 667 (6th Cir. 1987)). The law in this circuit clearly prohib-

its a court faced with a dispute over sentencing factors from adopting the factual findings of the presentence report without making factual determinations of its own. See, e.g., Tackett, 113 F.3d at 613–14; United States v. Edgecomb, 910 F.2d 1309, 1313 (6th Cir.1990) ("If a district court fails to make a factual finding, this court must remand for resentencing."); United States v. Mandell, 905 F.2d 970, 974–75 (6th Cir.1990).[11] In Tackett, this court reviewed a sentence imposed by a district court that was "completely silent" on contested issues, and merely stated that it adopted "the factual findings and guideline applications in the presentence report." Id. at 614. In Mandell, we decided that a district court violated Rule 32 when it accepted of a pre-sentence report's recommended sentencing level without making any findings of fact on disputed issues. 905 F.2d at 974. Edgecomb presented a similar situation in which a district court failed to respond at all to objections to a pre-sentence report. 910 F.2d 1309.

■■■ Although this case does not present such a drastic violation, we find that the District Court did not comply with the requirements of Rule 32(c)(1). When it sentenced defendant, the court made an oral finding regarding the contested calculation of enhancement levels based on the value of loss resulting from defendant's offense. It stated that it was "convinced that the defendant is at least the minimum amount [sic], at least responsible for in excess [of] 80 million dollars, so the calculation will be 18." Although

9. Rule 32(c)(1) provides as follows:

> At the sentencing hearing, the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony or other evidence on the objections. For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

FED R.CRIM. P. 32(c)(1).

10. U.S.S.G. § 6A1.3(b) provides that:

> The court shall resolve the disputed sentencing factors in accordance with rule 32(a)(1), Fed. Crim. P. (effective Nov. 1, 1987), notify the parties of its tentative findings and provide a reasonable opportunity for the submission of oral or written objections before the imposition of sentence.
> § 6A1.3(b).

11. In Fry, Edgecomb, and Mandell, we construed the duty of district courts under the predecessor to Rule 32(c)(1), the former FED R.CRIM.P. 32 (c)(3)(D). In Tackett, we noted that "[t]he provisions are identical," and held that the same duties apply under the new rule. 113 F.3d at 613 n. 8.

the District Court did make this finding of fact, it did not explain how it calculated the amount of loss or respond to the defendant's specific factual objections to the methods of calculation included in the PSI. The District Court also issued no written findings of fact as Rule 32 requires. See *Edgecomb,* 910 F.2d 1309, 1313 ("Rule 32(c)(3)(D) provides that if there is any allegation of a factual inaccuracy, the court must make a written factual finding or a determination that such a finding is not necessary."). The only written comments regarding contested issues are the statements in the Judgment that "[t]he court adopts the factual findings and guideline application in the presentence report except ... [t]he Court grants 18 points instead of 22 for Specific Offense Characteristic. The Court grants four points instead of two for the Adjustment for Role in the Offense." These statements, however, are written applications of the guidelines, not written findings of fact.

■ In light of this Circuit's holding that Rule 32 should be strictly enforced, we vacate the eighteen level enhancement of defendant's sentence and remand for re-sentencing, at which time the District Court should issue written findings of fact that respond to defendant's objections to the PSI. Although this may or may not change the defendant's sentence, as we stated in *Tackett,* "literal compliance" with Rule 32 "helps to ensure that defendants are sentenced on the basis of accurate information and provides a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." 113 F.3d at 614–15. Because the District Court did not disclose the specifics of its calculation or respond to defendant's specific objections to the PSI's loss valuation methods, we can only infer that it had accepted the government's argument that the trial evidence and victim statements established losses that surpassed the Guidelines' eighty million dollar threshold for an enhancement of eighteen levels. Although the court need not establish the value of the loss with precision, see *United States v. Kohlbach,* 38 F.3d 832, 835 (6th Cir.1994) (citing § 2F1.1, comment. (n.8)), Rule 32 requires it to publish the resolution of contest-

ed factual matters that formed the basis of its calculation.

■ Defendant's second argument concerning sentencing is that the District Court erroneously added four levels pursuant to U.S.S.G. § 2F1.1(b)(6)(B). That section directs a court to increase the offense level by four levels "[i]f the offense ... affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." *Id.* He asserts that the District Court improperly grouped the counts affecting financial institutions with the counts representing offenses from which defendant derived over one million dollars in receipts. Defendant argues that this enhancement does not apply to his case because he did not derive a million dollars from the offenses that affected the financial institutions. The government argues that for the enhancement to apply, the money need not come directly from a financial institution as long as there is a financial institution affected by the offense and the defendant gains more than one million dollars from the offense. The District Court held that the offense for purposes of sentencing comprised all the counts for which defendant had been convicted. Because this offense affected financial institutions and defendant received over a million dollars, it applied this four level enhancement.

■ The District Court did not misapply the Guidelines in giving this enhancement. The plain language of the Guidelines indicates that the defendant must derive a million dollars from the offense, not from the financial institutions. The commentary of the Guidelines provides that " '[g]ross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2F1.1, comment. (n.16). Thus, it is clear that the this enhancement applies even if the defendant receives the million dollars in an indirect manner. There is no dispute that as a result of his criminal activity, defendant received more than a million dollars. The question is whether the money that defendant received came from the same offense that affected the financial institutions. The Guidelines man-

date that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group" for the purposes of sentencing. U.S.S.G. § 3D1.2. The Guidelines explain that counts involve substantially the same harm "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss." *Id.* at § 3D1.2(d). In addition, the Guidelines specifically state that offenses covered by § 2F1.1 "are to be grouped under this subsection." *Id.* The court, therefore, correctly grouped counts two through 106, offenses covered by § 2F1.1. Furthermore, defendant was convicted of a conspiracy that encompassed and united all of the other counts of illegal conduct, except the tax and the obstruction of justice counts. We affirm the District Court's conclusion that defendant received over a million dollars from an offense that affected financial institutions, thereby warranting an enhancement of four levels.

Defendant's third argument is that his sentence should be remanded because the District Court misapprehended its power to depart downward from the Guidelines. Defendant relies on the District Court's statement at sentencing that it "wishe[d] it had the power not to be bound by the sentencing guidelines." The record shows that this statement was one of a number of statements the judge made reflecting his displeasure with the sentencing guidelines. These statements, taken in sum, however, do not indicate that the judge misapprehended his power to depart downward. On remand the District Court will have the opportunity to resolve any ambiguity surrounding this issue.

 Defendant's final objection to the sentencing, the imposition of a fine of one million dollars, is without merit. Defendant argues that this fine was an abuse of discretion under 18 U.S.C. § 3572(b), which states as follows:

> If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.

§ 3572(b). This section does not apply to this case, because, as even the defendant admits, the court did not require defendant to make restitution as part of his sentence. We find that the fine was not an abuse of discretion.

### III. Conclusion

For the foregoing reasons, we affirm defendant's conviction on all counts. We vacate his sentence and remand to the District Court for sentencing in a manner consistent with this opinion.