UNITED STATES OF AMERICA

v.

**Martin L. GRASS Franklin C. Brown Franklyn M. Bergonzi**

**Nos. CR. 1CR02–146–01, CR. 1CR02–146–02, CR. 1CR02–146–03.**

United States District Court,
M.D. Pennsylvania.

March 18, 2003.

See, also, 239 F. Supp.2d 535.

Kim Douglas Daniel, U.S. Attorney's Office, Harrisburg, PA, for Plaintiff.

Mark T. Stancil, Baker Botts LLP, Washington, DC, Martin L. Grass, Virginia Beach, VA, Mary C. Spearing, Rebecca H. Ewing, William H. Jeffress, Baker Botts LLP, Washington, DC, for Martin L. Grass.

April A. Oliver, Erik L. Kitchen, Matthew L. Stennes, Reid H. Weingarten, Steptoe & Johnson, LLP, Washington, DC, Franklin C. Brown, Joseph U. Metz, Dilworth Paxson LLP, Harrisburg, PA, for Franklin C. Brown.

Franklin M. Bergonzi, Hummelstown, PA, Ira H. Raphaelson, William J. Stuckwisch, O'Melveny & Myers LLP, Washington, DC, William John Fulton, Harrisburg, PA, for Franklin M. Bergonzi.

Edward F. Mannino, Jason A. Snyderman, Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, for Deloitte & Touche, LLP.

Eric Sitarchuk, Ballard, Spahr, Andrews & Ingersoll, Paul Lantieri, III, Philadelphia, PA, for Rite Aid Corporation.

### MEMORANDUM

RAMBO, District Judge.

Before the court is Defendants Martin Grass, Franklin Brown, and Frank Bergonzi's renewed motion to dismiss Count 32 of the Indictment. The parties have briefed the issue, and the matter is ripe for disposition.

### I. *Background*

On June 21, 2002, a federal grand jury sitting in Harrisburg, Pennsylvania issued a thirty-seven count indictment against Defendants, former officers and directors for the Rite Aid Corporation.[1] In Counts 26 through 29 of the Indictment, the Government charges Defendants with four counts of wire fraud. The accusations arise out of the following actions: (1) the transfer of approximately $2.6 million from a Rite Aid account at Chase Manhattan Bank into an account belonging to CCA Associates, Inc. ("CCA"), a subsidiary of a partnership owned by Defendant Grass and his brother-in-law (Count 26); (2) the transfer of approximately $898,000 from Rite Aid to Defendant Grass as a bonus for Rite Aid's performance during its fiscal year ("FY") 1998 (Count 27); (3) the transfer of approximately $337,000 to Defendant Brown as a bonus for FY 1998 (Count 28); (4) the transfer of approximately $300,000 to Defendant Bergonzi as a bonus for FY 1998 (Count 29). Based on these allegations, the Government, in Count 32 of the Indictment, asserts that it is entitled to a criminal forfeiture of Defendants' assets derived from the fruits of the alleged wire frauds. *See* 18 U.S.C. § 982(a)(2)(A). On September 4, 2002, Defendants moved to

---

1. A current Rite Aid Vice President, Eric Sorkin, is charged under Counts 33 and 37 of the indictment. Defendant Sorkin, however, is charged in neither Counts 26 to 29, nor Count 32.

dismiss that count pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).[2]

By an order dated December 17, 2002, the court denied that motion without prejudice to renew the motion after the Government filed a bill of particulars as to Count 32. *United States v. Grass, et al.*, Nos. CR:02–146–01, 02, 03 order (M.D.Pa. Dec. 17, 2002). The Government argued, in opposition to Defendants' original motion to dismiss Count 32, that its allegations in that count were legally sufficient because the allegations tracked the language of the applicable criminal forfeiture statute. The court rejected that contention, finding that the mere accusation that Defendants' fraud "affected a financial institution" was so vague that it prevented Defendants from mounting a defense. *United States v. Grass*, Nos. CR:02–146–01, 02, 03 slip. op. at 7 (M.D.Pa. Dec. 17, 2002) [hereinafter "Memo. Dec. 17, 2002"] (quoting Indictment, Count 32 at ¶ 2); *see also* 18 U.S.C. § 982(a)(2)(A). The court also held that the Government's descriptions of four separate wire transfers from Rite Aid's bank accounts did not cure this defect for one of two alternative reasons.

> First, if the transfer of funds from one account to another is the only manner in which the financial institution is affected, then ... the allegations fail because ... 18 U.S.C. § 982(a)(2)(A) requires that the financial institution be adversely affected in some manner to trigger a criminal forfeiture of the wire fraud's proceeds.... Mere use of [the financial institution] to execute the transfers will not suffice as a matter of law. Second, if the wire transfers affected these financial institutions in other ways – or if

the wire transfers affected other unnamed financial institutions – then Count 32 fails in that it does not adequately inform Defendants of the nature of the charges against them.

.    .    .    .    .

> It is important to resolve which of these reasons actually applies; although it is impossible to do so on the record currently before the court. If the first reason applies – and the indictment is insufficient because it does not allege that a financial institution was adversely affected – the remedy is to dismiss Count 32 of the indictment for failure to allege a crime.... On the other hand, if the second reason applies – and the indictment is insufficient because it merely fails to adequately specify the manner in which the wire frauds affected a financial institution or which financial institutions were affected – then this error may be cured by a bill of particulars.

*Id.* at 7–8.

Because Defendants' motion for a bill of particulars regarding Count 32 was pending at the time, the court granted that motion in lieu of dismissing the count as legally deficient. The court admonished the Government that its bill of particulars "should remove any doubt as to the manner in which Defendants' alleged wire fraud affected financial institutions and what financial institutions it affected." *Id.* at 9.

On December 23, 2002, the Government filed the Bill of Particulars with respect to Count 32 of the Indictment. In that docu-

---

**2.** Effective December 1, 2002, the Federal Rules of Criminal Procedure have been amended. However, according to the Advisory Notes accompanying Rule 12 the changes "are intended to be stylistic only ...", and "[n]o change in practice is intended." The

New Rule 12 places the old Rule 12(b)(2) at Rule 12(b)(3)(B). Accordingly, even though the parties and cases cite old Rule 12(b)(2), the court will refer to the operative rule as Rule 12(b)(3)(B).

ment, the Government lists the losses that the "affected" financial institutions suffered as a result of Defendants' alleged wire frauds. As to Count 26, relating to the transfer of approximately $2.6 million from Rite Aid's account at Chase Manhattan Bank to CCA's account at Dauphin Deposit,[3] Chase Manhattan was adversely affected by this process through "loss of income and expenses incurred as a consequence of transferring $2,613,212 from that financial institution to another entity." (Bill of Part. at 2.) PNC Bank was adversely affected by the potential loss of proceeds derived from its sale of the eighty-three acre parcel of land and through its exposure to potential fees and expenses that it may have had to incur to defend its title to the money it derived from a transaction with CCA. (*Id.*) As to Counts 27, 28, and 29 – which pertain to the transfers of funds from Rite Aid's account with Dauphin Deposit Bank to pay FY 1998 bonuses to Defendants Grass, Brown, Bergonzi – the Government alleges that Dauphin Deposit suffered in the form of lost interest that it would have received had Defendants not fraudulently procured the transfer of funds, in addition to expenses that Dauphin Deposit incurred in transferring the funds. (*Id.* at 3.) On January 13, 2003, Defendants filed a renewed motion to dismiss Count 32 pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).

## II. *Legal Standard: Motion to Dismiss*

"An indictment is an accusation only, and its purpose is to identify the defendant's alleged offense ... and fully inform the accused of the nature of the charges so as to enable him to prepare any defense he might have." *United States v. Stansfield,*

171 F.3d 806, 812 (3d Cir.1999) (quotations and citations omitted). A defendant, however, may move to dismiss an indictment based on defects in the indictment, lack of jurisdiction, or failure to charge an offense. Fed.R.Crim.P. 12(b)(3)(B).

An indictment, however, is sufficient "if it, first contains the elements of the offense charged and fairly informs a defendant of the charge against him, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (citing *Hagner v. United States,* 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932) and *United States v. Debrow,* 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953)); *accord United States v. Cefaratti,* 221 F.3d 502, 507 (3d Cir.2000) ("An indictment ... to be sufficient must contain all essential elements of the charged offense."). In addressing a motion pursuant to Rule 12(b)(3)(B), the indictment "is to be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hall,* 20 F.3d 1084, 1087 (10th Cir.1994); *accord United States v. Caicedo,* 47 F.3d 370, 371 (9th Cir.1995); *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1082 (5th Cir.1978).

## III. *Discussion*

In Counts 26 through 29, Defendants are accused of committing wire fraud in violation of 18 U.S.C. § 1343. In Count 32, the Government seeks criminal forfeiture of money and land obtained through the alleged wire frauds based on 18 U.S.C. § 982(a)(2)(A). In support of their argument for dismissing Count 32, Defendants contend that Count 32 fails, as a matter of

---

**3.** According to the Indictment, CCA, an entity co-owned by Defendant Grass, used the money to pay off company debts and to purchase an eighty-three acre parcel of land located in Fairview Township, York County, Pennsylvania. (*See* Indictment, Count 1 at ¶¶ 18–22.)

law, because the Government alleges the financial institutions implicated in Counts 26 through 29 merely served as conduits for the fraudulent transfers and, thus, were not adversely affected by such transactions. For the reasons stated below, the court agrees and will dismiss Count 32 of the indictment.

### A. *Chase Manhattan Bank and Dauphin Deposit*

■ Count 26 of the Indictment, as now explicated by the Bill of Particulars, alleges that Defendants, through fraudulent means, caused Chase Manhattan Bank to transfer approximately $2.6 million from Rite Aid's account to an account belonging to CCA. As a result, Chase Manhattan suffered through unspecified lost income and expenses incurred in transferring the money. Counts 27 through 29, allege that Defendants, through fraudulent accounting, caused Dauphin Deposit to transfer FY 1998 bonuses from a Rite Aid account to Defendants. As a result, Dauphin Deposit, like Chase Manhattan, suffered through the loss of income and expenses incurred in transferring the funds.[4]

The court finds that these allegations, even if true, are insufficient to obtain a criminal forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A) because the allegedly fraudulent wire transfers did not adversely affect Chase Manhattan or Dauphin Deposit. In relevant part, § 982(a)(2)(A) reads as follows:

> The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate ... section ... 1343 [wire fraud] ... of this title, *affecting a financial institution* ... shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of such violation.

*Id.* (emphasis added).

■ Thus, § 982(a)(2)(A) requires that a wire fraud affect a financial institution to allow the Government to obtain the fraud's proceeds through a criminal forfeiture. As the court previously held, "the term 'affecting a financial institution' requires an allegation that the financial institution was affected in an adverse manner, rather than merely used as an instrumentality of the crime." *See* Memo. Dec. 17, 2002 at 4–6 (citing *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir.2000) (holding enhanced sentencing provisions for wire fraud affecting a financial institution available only if "the institution itself were victimized by the fraud, as opposed to the scheme's mere utilization of the financial institution in the transfer of funds"); *United States v. Agne*, 214 F.3d 47, 51 (1st Cir.2000) (holding that ten-year statute of limitations for charges of fraud affecting a financial institution is unavailable unless there is "some negative consequence to the financial institution to invoke the extended statute of limitations"); *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir.1998) (holding that offense affected a financial institution where securities firm used as instrumentality of the fraud was subsequently sued by bankruptcy trustee for $150 million); *United States v. Johnson*,

---

4. The Bill of Particulars does not specify what are Chase Manhattan and Dauphin Deposit's lost income and expenses. It does not specify what the amount of those losses are and when they occurred. The Government's brief in opposition to the instant motion, however, makes clear that these allegations refer to routine expenses and lost income as a result of the transfer of the money. (*See* Govt. Br. in Opp. Defs. Renewed Mot. to Dis. at 10 ("The United States intends to prove that these financial institutions lost income, particularly in the form of interest earnings, and incurred expenses as a result of the transfers listed as to each count. This is an adverse effect on such financial institutions.").)

130 F.3d 1352, 1355 (9th Cir.1997) (holding enhanced sentencing guideline applicable where embezzlement affected a bank by causing it legal expenses and by damaging its reputation, its employees' morale, and its customer relations); *United States v. Schinnell,* 80 F.3d 1064, 1070 (5th Cir. 1996) (same, where forgery "realistically exposed [bank] to substantial potential liability" because fraud victim and bank were involved in negotiating settlement and fraud victim indicated that if settlement fell through it would sue bank to recover lost funds); *United States v. Mizrachi,* 48 F.3d 651, 656 (2d Cir.1995) (same, construing "affecting" a financial institution to require victimization of the institution); *United States v. Pelullo,* 964 F.2d 193, 214–16 (3d Cir.1992) (holding available extended statute of limitations for wire fraud affecting a financial institution where fraud was perpetrated on wholly-owned subsidiary of financial institution); *United States v. Esterman,* 135 F.Supp.2d 917, 920 (N.D.Ill.2001) (holding criminal forfeiture unavailable under § 982(a)(2)(A) where financial institution was merely conduit for transfer of funds)).[5]

In effect, the Government argues that Chase Manhattan and Dauphin Deposit suffered adverse effects from Defendants' alleged wire frauds because those banks could no longer earn interest on the money that Defendants caused to be transferred from Rite Aid's accounts. Under the Government's theory, any time a wire fraud causes a bank to transfer funds, criminal forfeiture would be appropriate without a showing that the financial institution suffered a loss or was exposed to some tangible, realistic risk. This argument stands in stark contrast to the holdings of numerous courts, including this court, that the mere transfer of funds does not affect a financial institution. Similarly, adopting the Government's contention with respect to lost income would convert the requirement that a wire fraud *affect* a financial institution to one requiring only that the wire fraud *access* a financial institution.[6] Courts have broadly interpreted the phrase "affecting a financial institution." *See, e.g., United States v. Bouyea,* 152 F.3d 192, 195 (2d Cir.1998) (holding that fraud affected a financial institution where fraud was perpetrated on wholly-owned subsidiary of financial institution which itself was not a financial institution). However, no court has extended its interpretation to include the type of losses banks ordinarily incur in conducting completely legitimate transactions. Accordingly, such losses are not enough to trigger a criminal forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A).

■ Likewise, where a bank incurs only routine transaction costs—which it would

---

**5.** In *Esterman,* the court pointed out that the term "affecting a financial institution" appears in various other provisions of the United States Criminal Code and Sentencing Guidelines. Therefore, cases interpreting that phrase in these other contexts are equally applicable in interpreting that phrase as it appears in § 982(a)(2)(A).

Whether a fraud does or does not "affect a financial institution" is a recurring consideration in federal criminal jurisprudence— that phrase makes a difference not only under Section 982(a)(2)(A) but also in statute of limitations terms under Sections 3282 and 3293(2) (under the latter statute, the normal statute of limitations is doubled "if the [wire fraud] offense affects a financial institution"), and the phrase also bears upon the classification of certain offenses for sentencing purposes and Sentencing Guideline considerations.

135 F.Supp.2d at 919. Accordingly, the court will cite cases interpreting this phrase in other contexts throughout this memorandum.

**6.** Tellingly, the Government does not cite a single case in support of its novel interpretation of the phrase "affecting a financial institution."

have incurred had the transaction been completely legitimate—the transaction does not affect a financial institution. Instead, the financial institution must be "victimized by the fraud." *Ubakanma,* 215 F.3d at 426. Routine costs for transactions which, from the bank's point of view, are completely normal do not satisfy this standard. *Esterman,* 135 F.Supp.2d at 920 (rejecting the Government's contention that bank was adversely affected where the bank "was called upon to do nothing more than to honor the authorizations that were wholly regular from the bank's perspective, conforming to the express terms of the signature cards that had been delivered to the bank"). From the bank's point of view, there is no difference between Defendants' transfers, procured through fraud, and legitimate Rite Aid transfers. Even assuming that the Government's allegations are completely true, the wire fraud did not affect the financial institutions anymore than a normal, legitimate transaction would have. Therefore, these financial institutions were not "affected" as that term is used in 18 U.S.C. § 982(a)(2)(A).

Surprisingly, the Government does not allege that any financial institution, or its subsidiary, was a Rite Aid shareholder. If such an entity were a Rite Aid shareholder, then Defendants alleged wire fraud would have affected that institution because the wire frauds allegedly victimized Rite Aid and its shareholders. *See, e.g., United States v. Monus,* 128 F.3d 376 (6th Cir.1997); *see also Pelullo,* 964 F.2d at 214–16 (holding that extended statute of limitations for wire fraud "affecting a financial institution" applicable where the defendant perpetrated fraud on wholly-owned subsidiary of financial institution). In *Monus,* the Government issued a 109 count indictment against the Chief Operating Officer of Phar–Mor, Inc., a retail discount drugstore chain. The indictment accused Monus of orchestrating a massive accounting fraud. Among other allegations, the Government contended that Monus submitted false financial statements to several financial institutions as a ploy to encourage those entities to purchase large blocks of Phar–Mor stock. *Id.* at 381. The Government obtained convictions against Monus on all 109 counts including the counts relating to the stock purchase fraud. At the sentencing stage, the United States Probation Officer recommended a four level enhancement in Monus's sentence because the offense affected a financial institution and Monus derived more than $1,000,000 in gross receipts from the offense. *Id.* at 395; *see also* U.S.S.G. § 2F1.1(b)(8)(B). The District Court granted the enhancement. On appeal, the Sixth Circuit upheld this portion of Monus's sentence. *See Monus,* 128 F.3d at 397 ("Because this offense affected financial institutions and defendant received over a million dollars, [the District Court] applied this four level enhancement.... The District Court did not misapply the Guidelines in giving this enhancement.").[7]

Because the sentencing guideline provision at issue in *Monus* employs the same terminology as the criminal forfeiture statute that the Government seeks to invoke here, the court would have no problem finding that the Government's allegation satisfied the requirements of the criminal forfeiture statute had the Government alleged that a financial institution, or its

---

7. The Sixth Circuit, however, vacated the sentence on other grounds. *See id.* at 397 (vacating the sentence because the District Court violated Federal Rule of Criminal Procedure 32(c)(1) by failing to explain factual findings relating to its determination that Monus derived more than $1 million from his fraud).

subsidiary, was a Rite Aid shareholder. *See supra* at n. 5. The holding would be the same had the Government alleged that a financial institution, or its subsidiary, purchased Rite Aid stock in reliance on fraudulent financial statements produced by Defendants. The Government, however, has made no such allegation.

As it stands, the Government alleges that Chase Manhattan and Dauphin Deposit were merely used as a conduit to transfer funds procured through a wire fraud. The losses that these institutions suffered, according to the Government's allegations, are nothing more than routine transaction fees and lost income. Had Defendants procured these transactions legally, the listed financial institutions would have lost this same income and incurred these same expenses. Therefore, the Government has not alleged, as to either Chase Manhattan Bank or Dauphin Deposit Bank, that Defendants' wire fraud affected a financial institution.

### B. *PNC Bank*

■ As previously stated, in Count 26, the Government alleges that Defendant Grass caused Chase Manhattan Bank to wire approximately $2.6 million from Rite Aid's account to a bank account belonging to CCA. (Indictment, Count 26 at ¶ 19.) That entity was the wholly-owned subsidiary of a real estate partnership owned by Defendant Grass and his brother-in-law, Tim Harrison. (*Id.*, Count 1 at ¶ 18.) According to the Indictment, CCA used the money to pay off the partnership's business debt and to purchase, from PNC, eighty-three acres of land located in Fairview Township, York County, Pennsylvania. (*Id.* at ¶¶ 19–20.) In the Bill of Particulars, the Government alleges that this transaction affected PNC in three ways, all of which give rise to criminal forfeiture. First, the Government alleges that the

wire fraud exposed PNC to the "risk of civil or criminal forfeiture of fraud proceeds or property traceable to fraud proceeds received by PNC Bank in exchange for 83 acres of real estate." (Bill of Part. at 2.) Second, the transaction affected PNC through its "unwitting involvement in financial transactions and monetary transactions in violation of 18 U.S.C. sections 1956(a)(1)(B) and 1957, by virtue of its receipt of proceeds or property traceable to fraud proceeds in exchange for the 83 acres." (*Id.*) Third, the transaction caused PNC the "loss of 83 acres and $245,000 deposit, both of which would have remained the property of PNC if CCA had not used proceeds of wire fraud or property traceable thereto to pay the $1.8 million." (*Id.*) For the reasons stated below, the court finds that these allegations do not amount to a wire fraud "affecting a financial institution" for which criminal forfeiture would be appropriate. 18 U.S.C. § 982(a)(2)(A).

### 1. PNC's Risk of Criminal or Civil Forfeiture

As stated previously, the Indictment, as explicated by the Bill of Particulars, alleges that Defendants fraudulently procured the transfer of approximately $2.6 million from a Rite Aid bank account to CCA's bank account. Allegedly, CCA then paid PNC $1.8 million of that money to purchase the eighty-three acres of land. The Government argues that criminal forfeiture of property that Defendants derived from the transfer of the funds is justified because the wire fraud exposed PNC to the potential risk of criminal or civil forfeiture of the money that it received from CCA.

The court disagrees. There is no indication that the Government has, or will, pursue a forfeiture of the $1.8 million which PNC derived from its transaction with

CCA. Moreover, it is clear, based on the allegations in the Indictment, that if the Government were to pursue a criminal or civil forfeiture, then PNC would have the benefit of an innocent owner defense. *See* 18 U.S.C. § 983(d)(3)(A). No civil forfeiture is permitted with respect to property which is in the possession of "an innocent owner." 18 U.S.C. § 983(d)(1). The Criminal Code defines an "innocent owner" as follows:

> With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term "innocent owner" means a person who, at the time that person acquired the interest in the property-
>
>> (i) was a bona fide purchaser or seller for value (including a purchaser or seller of goods for value); and
>>
>> (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture.

18 U.S.C. § 983(d)(3)(A).

The Indictment, as explicated by the Bill of Particulars, indicates that PNC was an innocent owner. Thus, civil forfeiture would not be appropriate. Likewise, there is no indication that PNC would be subject to a criminal forfeiture, which would occur only if the Government obtained a conviction against PNC. There is absolutely no allegation in the Indictment indicating that PNC's conduct was anything other than innocent. Thus, the Government's contention that PNC *might* have to defend its title to the $1.8 million in a forfeiture action is untenable and inconsistent with the Government's contention that PNC was employed as an innocent cog in Defendants' extensive fraud conspiracy. Although the court, in ruling on a Rule 12(b)(3)(B) motion, is required to accept the factual allegations in the Indictment as true, the Government's accusations here amounts to nothing more than a speculative and incorrect legal conclusion unsupported by factual allegations. Thus, it is entitled to no deference.

The Government does not allege any facts implicating PNC in the fraudulent transaction, nor does it allege that civil or criminal forfeiture proceedings have, or will, be initiated against PNC. The Government simply contends that it *might* initiate such proceedings against PNC. However, this does not amount to the tangible potential threat to PNC that other courts have held would amount to an adverse effect against a financial institution. In each of those cases, as distinguished from the instant situation, the defendant's fraud had some sort of real world impact on the financial institution. *See, e.g., Bennett,* 161 F.3d at 193 (holding that offense affected a financial institution where securities firm used as instrumentality of the fraud was subsequently sued by bankruptcy trustee for $150 million and the firm settled the claim for $18 million); *Johnson,* 130 F.3d at 1355 (holding enhanced sentencing guideline applicable where embezzlement affected a bank by causing it unreimbursed losses of $500,000 which "included a $50,000 deductible under the bank's fidelity bond, legal expenses, auditor's fees, and wages for extra staff hours spent dealing with the offense"); *Mizrachi,* 48 F.3d 651, 656 (2d Cir.1995) (holding that offense affected a financial institution where bank suffered a $4 million loss); *Pelullo,* 964 F.2d 193, 216 (3d Cir.1992) (holding available extended statute of limitations for wire fraud affecting a financial institution where wholly-owned subsidiary of financial institution lost approximately $1.6 million).

The Fifth Circuit's opinion in *United States v. Schinnell* is the closest the court has come to finding any support for the Government's contention. 80 F.3d 1064 (5th Cir.1996). In that case, Schinnell worked in the accounting department of

Trammell–Crow, a real estate firm located in Dallas, Texas. Over a period of five and a half years, Schinnell used her position to withdraw funds from various Trammell–Crow bank accounts for her personal use. *Id.* at 1065–66. Once the scam came to light, Schinnell pled guilty. At sentencing, the court imposed a four level enhancement under former Sentencing Guideline 2F1.1(b)(6)(B) for a fraud over $1 million "affecting a financial institution."[8] The district court held that the enhancement was justified, relying on a finding in the presentence report that Trammell–Crow and one of the banks involved had entered into a tolling agreement preserving the firm's right to sue the bank for its lost proceeds. *Id.* at 1070. On appeal, the Fifth Circuit upheld this holding, reasoning that the extensive nature of the fraud was such that "direct harm to the banks involved was certainly reasonably foreseeable." *Id.* Additionally, the existence of the tolling agreement further demonstrated that Schinnell's fraud "realistically exposed [the banks] to substantial potential liability...." *Id.*

This case, however, is easily distinguishable. Here, the Government has not alleged any facts demonstrating that Defendants' fraud realistically exposed PNC to the risk of criminal or civil forfeiture. The Government alleges that Defendants, not PNC, fraudulently procured Rite Aid funds. There is no allegation that PNC's involvement was anything other than innocent. Therefore, neither civil nor criminal forfeiture would lie against PNC. Accordingly, the court finds that the Government's allegation that Defendants used fraudulently procured funds to purchase a piece of property from PNC is insufficient to conclude that the transaction affected a financial institution.

### 2. PNC's "Unwitting" Involvement in Illegal Monetary Transactions

■ According to the Government's next argument, Defendants procured PNC's "unwitting" involvement in illegal monetary transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B) and 1957 and that this involvement somehow adversely affected the bank. Essentially, the Government's argument is that PNC suffered an adverse effect because, "[b]anks do not like to be involved in fraud, nor in money laundering." (Govt. Br. in Opp. Renewed Mot. to Dis. Count 32 at 9.) This simply does not satisfy the requirements necessary to trigger a criminal forfeiture. As the court held previously, the term "'affecting a financial institution [in § 982(a)(2)(A)] requires an allegation that the financial institution was affected in an adverse manner, rather than merely used as an instrumentality of the crime.'" Memo. Dec. 17, 2002 at 4. Although banks may not like being used as the instrumentality of a fraud or illegal monetary transaction, the use of a bank for such a purpose does not trigger criminal forfeiture under § 982(a)(2)(A) unless the bank suffers some sort of tangible loss. The mere fact that PNC may have been duped by Defendants, standing alone, is insufficient to satisfy this standard.

### 3. PNC's "Loss" of the Land and the $245,000 Deposit

■ Finally, the Government argues that PNC suffered an adverse effect from Defendants' wire fraud through the "loss of 83 acres and $245,000 deposit, both of which would have remained the property of PNC Bank if CCA had not used proceeds of wire fraud ... to pay the $1.8 million purchase price...." (Bill of Part. at 2.) As the Government presents it, had

---

8. This provision now appears in the Sentencing Guidelines at § 2F1.1(b)(8)(B).

Defendants not caused a fraudulent wire transfer of $2.6 million from Rite Aid, CCA would have been unable to pay PNC the $1.8 million purchase price for the eighty-three acre parcel of land in Fairview Township. If CCA did not have the money to pay PNC, CCA would have forfeited its $245,000 deposit on the land, and PNC would have retained the property. Thus, as an indirect result of the fraud, PNC lost the $245,000 and the land.

This is not an adverse effect on the bank. PNC received the full price of its arm's length transaction with CCA. It would border on the absurd to conclude that PNC suffered an adverse effect where it received $1.8 million as a result of the transaction. At worst, the loss the Government points to – the loss of the $245,000 deposit plus the ability to sell the land to another purchaser – represents the loss of a windfall. This is not the type of loss which triggers a criminal forfeiture for a wire fraud "affecting a financial institution." 18 U.S.C. § 982(a)(2)(A).

In summation, the Government's allegations in Count 32 fail as a matter of law. The Government has not alleged facts, in either the Indictment or its Bill of Particulars, indicating that any of Defendants' allegedly fraudulent wire transfers affected a financial institution in such a manner to trigger a criminal forfeiture pursuant to § 982(a)(2)(A). Therefore, Count 32 is facially invalid because it fails to allege a necessary element of the offense. Accordingly, the court will grant Defendants' motion to dismiss that count.

**C. *The court's holding does not constitute a premature challenge to the sufficiency of the Government's evidence.***

■ Finally, the Government argues that dismissing Count 32 would constitute an impermissible judgment on the suffi-

ciency of the Government's evidence. According to its argument, pursuant to Rule 7(c)(2), the Government need only allege that Defendants' property is subject to a criminal forfeiture. By tracking the applicable statutory language, the Government has satisfied its pleading burden. The court disagrees.

■ The Government's argument is nothing more than a rehashing of the argument it presented in opposition to Defendants' original motion to dismiss Count 32. The court, however, rejected that argument. *See* Memo. Dec. 17, 2002 at 6–9. As the court indicated previously, "an indictment may track the language of the statute, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *United States v. Shirk,* 981 F.2d 1382, 1389 (3d Cir.1992) (quoting *Hamling v. United States,* at 418 U.S. 87, 117, 94 S.Ct. 2887 (1974)). In other words, an indictment may merely track the statute's language where the common sense understanding of the statute is sufficient to put the defendant on notice as to the factual nature of the charges against him. However, "[a]n indictment not framed to apprise the defendant 'with reasonable certainty, of the nature of the charges against him ... is defective, although it may follow the language of the statute.'" *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (quoting *United States v. Simmons,* 96 U.S. 360, 362, 6 Otto 360, 24 L.Ed. 819 (1877)).

The court went on to find that the mere allegation that Defendants' fraudulently procured wire transfers "affected financial institutions" was insufficient to put Defendants on notice of the factual nature of the charges against them. *See* Memo. Dec. 17, 2002 at 7. Accordingly, the court ordered

the Government to supplement the Indictment by filing a bill of particulars with respect to Count 32. *Id.* at 8–9. Thus, the Government's allegation tracking the statutory language of 18 U.S.C. § 982(a)(2)(A) did not satisfy the minimal requirements for an indictment. The allegations set forth in the Bill of Particulars are legally deficient because the Government has failed to allege an essential element – that the wire fraud affect a financial institution – for a criminal forfeiture under that statute. Accordingly, the court will dismiss that count.

Contrary to the Government's argument, Rule 7(c)(2) does not supplant the requirement that the Indictment fully inform Defendants of the nature of the charges against them. Rule 7(c)(2) reads as follows: "No judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information provides notice that the defendant has an interest in property, that is subject to forfeiture in accordance with the applicable statute." This rule provides that the Government must give notice to a defendant that his property is subject to a criminal forfeiture. The court does not hold that the Indictment failed to do this. Rather, the court holds that the facts alleged in the Indictment – as explicated by the Bill of Particulars – are insufficient to entitle the Government to a criminal forfeiture. Although the indictment states that Defendants' wire fraud "affected financial institutions," the facts alleged indicate that the fraud did not affect financial institutions. (Indictment, Count 32 at ¶ 2.) That is, the effects cited by the Government are legally insufficient to obtain a conviction under 18 U.S.C. § 982(a)(2)(A). This is not an impermissible judgment on the sufficiency of the Government's evidence to obtain a conviction before the jury. Rather, it is a permissible judgment on the legal sufficiency of the Government's fac-tual allegations. Even assuming that every *fact* alleged in the Indictment and Bill of Particulars is true, those facts do not support the legal conclusion that Defendants' wire frauds affected a financial institution; an element necessary to obtain a conviction under § 982(a)(2)(A). Accordingly, the court will dismiss Count 32 of the Indictment.

## IV. *Conclusion*

Because the court finds that Count 32 of the Indictment, as explicated by the Bill of Particulars, fails to allege an element necessary to obtain a conviction for violation of 18 U.S.C. § 982(a)(2)(A) – namely, that Defendants committed a wire fraud or frauds "affecting a financial institution" – the court will grant Defendants' renewed motion to dismiss that count.

### ORDER

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT** Defendants' renewed motion to dismiss Count 32 of the indictment is **GRANTED.** Count 32 of the Indictment is **DISMISSED.**